**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| |
|---|
| **ZYDUS WORLDWIDE DMCC,** |
| **Plaintiff,** |
| **v.** |
| **TEVA API INC.,** |
| **Defendant.** |

Civ. No. 19-17086 (KM) (JBC)

**OPINION**

**KEVIN MCNULTY, U.S.D.J.:**

Now pending before the Court is the motion (DE 17) of the defendant Teva API Inc. ("TAPI") to dismiss the Complaint (DE 1). Plaintiff Zydus Worldwide DMCC ("Zydus") brings suit, asserting that TAPI breached the parties' binding Letter of Intent ("LOI"). The LOI is a contract by which TAPI undertook to supply Zydus with an active pharmaceutical ingredient, Form I rotigotine, which Zydus needed to manufacture and sell a generic form of a prescription drug called Neupro. TAPI now moves to dismiss the Complaint, asserting that the parties' dispute is subject to a forum-selection provision in a separate agreement, an Asset Purchase Agreement ("APA") entered into between Zydus and TAPI's parent, Teva Pharmaceutical Industries Ltd. ("Teva"). Under the forum-selection clause in the APA, says TAPI, the parties are required to submit this dispute to a federal or state court in New York. TAPI therefore moves to dismiss the entire complaint. It also moves separately to dismiss the promissory estoppel claim in Count 3 for failure to state a claim.

For the reasons explained herein, I will grant in part and deny in part the motion to dismiss. For clarity, I have explicitly denied various other formal and informal requests to dismiss, stay, or transfer this action.

## I.     Summary[1]

### A.     Rotigotine

Currently, a prescription medicine with the active ingredient rotigotine is sold in the U.S. under the brand name Neupro. (Compl. ¶ 9) Neupro is prescribed for the treatment of Parkinson's disease and moderate-to-severe primary restless leg syndrome. (*Id.*)

Generic forms of Neupro are also being developed. Premised on the new drug application ("NDA") for Neupro, No. 021829, TAPI's parent, Teva, developed a generic line of rotigotine products and filed an abbreviated new drug application ("ANDA"). (*Id.*) Teva's ANDA "for the generic rotigotine pharmaceutical products . . . specified that the products would be manufactured using Form I rotigotine manufactured by TAPI." (*Id.* ¶ 2)

### B.     Background to the Zydus and TAPI transaction

"On or about July 26, 2015, Teva announced that it would acquire the generic drug business of Allergan plc ('Allergan')." (*Id.* ¶ 11) However, the Federal Trade Commission ("FTC") raised antitrust objections to the potential acquisition. (*Id.*) To neutralize those antitrust issues, Teva negotiated with the

---

[1]     Citations to the record will be abbreviated as follows. Citations to page numbers refer to the page numbers assigned through the Electronic Court Filing system, unless otherwise indicated:

"DE" =          Docket entry number in this case.

"Compl." =    The Complaint filed by Zydus in this action (DE 1)

"TAPI Brf." = TAPI's Memorandum of Law in support of this motion (DE 17)

"Zydus Brf." = Zydus's Memorandum of Law in opposition (DE 20)

"TAPI Reply Brf." = TAPI's Memorandum of Law in reply (DE 23)

"LOI" =          Letter of Intent, dated May 24, 2016, between TAPI and Zydus (Walsh Decl. Ex. 3, DE 17-3 at 232; more conveniently at DE 20-2)

"APA" =         Asset Purchase Agreement, dated June 16, 2016, between Teva and Zydus (Walsh Decl. Ex. 2, DE 17-3 at 115)

FTC to divest itself of certain assets, including Teva's "Rotigotine Product Assets." (*Id.* ¶¶ 11–12)[2]

Teva found a willing purchaser for those assets in Zydus. Teva agreed to divest its rotigotine products "by selling them to Zydus, which would own the associated ANDA and take over the eventual sale, following FDA approval, of the Rotigotine Products in the United States. Teva and Zydus entered into an Asset Purchase Agreement (the "APA"), dated as of June 16, 2016, under which Teva agreed to sell and assign Teva's Rotigotine Product Assets (including the Rotigotine ANDA) to Zydus." (*Id.* ¶ 13)

---

[2]     As background, I note that Zydus has submitted a copy of an FTC Decision and Order relating to the Teva/Allergan transaction, which provides as follows:

Not later than ten (10) days after the Acquisition Date, Respondents shall divest the Group E Product Assets [defined to include Rotigotine Product Assets] and grant the Divestiture Product Licenses related to the Group E Products [defined to include Rotigotine Products], absolutely and in good faith, to Zydus pursuant to, and in accordance with, the Group E Product Divestiture Agreements (which agreements shall not limit or contradict, or be construed to limit or contradict, the terms of this Order, it being understood that this Order shall not be construed to reduce any rights or benefits of Zydus or to reduce any obligations of Respondents under such agreements), and each such agreement, if it becomes a Remedial Agreement related to the Group E Product Assets is incorporated by reference into this Order and made a part hereof; provided, however, that if Respondents have divested the Group E Product Assets to Zydus prior to the Order Date, and if, at the time the Commission determines to make this Order final and effective, the Commission notifies Respondents that Zydus is not an acceptable purchaser of any of the Group E Product Assets, then Respondents shall immediately rescind the transaction with Zydus, in whole or in part, as directed by the Commission, and shall divest the relevant Group E Product Assets within one hundred eighty (180) days after the Order Date, absolutely and in good faith, at no minimum price, to an Acquirer that receives the prior approval of the Commission, and only in a manner that receives the prior approval of the Commission; provided further, however, that if Respondents have divested the Group E Product Assets to Zydus prior to the Order Date, and if, at the time the Commission determines to make this Order final and effective, the Commission notifies Respondents that the manner in which the divestiture was accomplished is not acceptable, the Commission may direct Respondents, or appoint a Divestiture Trustee, to effect such modifications to the manner of divestiture of the Group E Product Assets to Zydus (including, but not limited to, entering into additional agreements or arrangements) as the Commission may determine are necessary to satisfy the requirements of this Order.

(DE 17-3 at 68–69)

### C.   Zydus and TAPI enter into LOI for supply of Form I Rotigotine

Access to sufficient quantities of Form I rotigotine was necessary for Zydus to manufacture and sell generic rotigotine products, and to obtain FDA approval to do so. (*Id.* ¶ 14) On May 24, 2016, Zydus and TAPI entered into a binding LOI whereby TAPI committed to provide Form I rotigotine to Zydus. (*Id.* ¶ 15) Zydus asserts that this guaranteed supply commitment was a precondition to its agreement to purchase all of Teva's rotigotine related assets. (*Id.*)

"The LOI was executed between [TAPI] and [Zydus] and pertained to "the supply of the active pharmaceutical ingredient Rotigotine (collectively, the 'API')." (LOI, DE 17-3 at 233) The LOI acknowledged that this supply of the API was related to a transaction memorialized in a separate "Master Purchase Agreement" between Teva and Zydus, dating from 2015. The LOI did not, however, further specify or adopt by reference the terms of that Master Purchase Agreement. (*Id.*) The LOI provided that it "represent[ed] a binding commitment with respect to the supply terms included herein"; however, it was subject to the negotiation of a definitive supply agreement between TAPI and Zydus. (*Id.*)

TAPI committed under the LOI to "negotiate in good faith the terms of the Definitive Agreement, pursuant to which Teva API shall supply the API on a non-exclusive basis to Zydus for use in the production of the Products and the sale by Zydus in the Territory of the Products during the Term (as defined below in Section 3)." (*Id.* at 234) Under the LOI, TAPI committed to supply "commercial quantities of Form I rotigotine at a price of $37,500/kg for the initial three-year term" with an option to extend the LOI for up to four more years. (*Id.* ¶ 16) The LOI "expressly stated that, notwithstanding the anticipated definitive agreement, 'this LOI represents a binding commitment with respect to the supply terms included herein.'" (*Id.* ¶ 17)

4

###### D.      The Asset Purchase Agreement ("APA")[3]

As outlined above, a second agreement is at issue here: the APA "made by and between [Zydus], a company formed as per rules and regulations of Dubai Multi Commodities Center Authority ("Buyer"), and [Teva], an Israeli corporation, acting directly or through its Affiliates ("Teva" or "Seller")." (DE 17-3 at 120)

The APA provided:

> WHEREAS, in order to resolve the concerns raised by the FTC staff in these alleged product markets in the United States, Teva has agreed to enter into this Agreement with Buyer to divest certain assets related to these products to Buyer, and to permit Buyer to replace the lost competition by manufacturing, marketing and

---

[3]      Zydus objects to TAPI's attaching to its motion to dismiss certain documents, including the APA and the FTC Order, and asserts that they are not properly before this Court. (*See* Zydus Brf. at 12) I disagree. When deciding a motion to dismiss, a court typically does not consider matters outside the pleadings. However, a court may consider documents that are "integral to or explicitly relied upon in the complaint" or any "undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document[.]" *In re Rockefeller Ctr. Props., Inc. Sec. Litig.*, 184 F.3d 280, 287 (3d Cir. 1999) (emphasis and citations omitted); *see In re Asbestos Prods. Liab. Litig. (No. VI)*, 822 F.3d 125, 133 n.7 (3d Cir. 2016); *Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014). In that regard, courts may consider matters of public record and exhibits attached to the complaint. *Schmidt*, 770 F.3d at 249 ("To decide a motion to dismiss, courts generally consider only the allegations contained in the complaint, exhibits attached to the complaint and matters of public record"); *Arcand v. Brother Int'l Corp.*, 673 F. Supp. 2d 282, 292 (D.N.J. 2009) (court may consider documents referenced in complaint that are essential to plaintiff's claim).

Reliance on such documents does not convert a motion to dismiss into a motion for summary judgment. "When a complaint relies on a document . . . the plaintiff obviously is on notice of the contents the document, and the need for a chance to refute evidence is greatly diminished." *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196-97 (3d Cir. 1993). The FTC Order, the APA, and the LOI are all extensively discussed in the complaint and are integral to the issues presented therein. They will be considered.

Zydus itself attaches to its opposition a copy of the LOI, as well as a letter from opposing counsel and briefs filed in connection with TAPI's motion to stay the New York action. (DE 20-2, 20-3, 20-4, 20-5) These, too, will be considered, not for the truth of any facts stated therein, but solely for their existence and legal effect. *See S. Cross Overseas Agencies, Inc. v. Wah Kwong Shipping Grp. Ltd.*, 181 F.3d 410, 426-27 (3d Cir. 1999) (judicial notice of existence of other proceedings).

> selling the generic products referred to above into the respective
> alleged product markets.

(*Id.*) "Product" was further defined in Exhibit C to mean "Rotigotine
Transdermal Patch" and "Minocycline HCl CAP" in various strengths. (DE 17-3
at 169)

The APA contains provisions concerning "Supply Products." That term,
however, is not defined so as to include any Rotigotine finished product, the
Rotigotine active pharmaceutical ingredient, or Form I rotigotine. Rather,
"Supply Products" are defined as "the generic pharmaceutical on-market
Supply Products listed on Schedule 6.1 that are to be supplied by the
Manufacturer to the Buyer hereunder." The products listed on Schedule 6.1
relate solely to certain capsules for a separate drug, Minocin. (DE 17-3 at 208)
Schedule 6.1 does not mention Rotigotine.

The term "Transferred Assets" under the APA is defined as "the following
assets of [Teva], as the same exist on the Closing Date that relate solely and
exclusively to the Products (and for the avoidance of doubt, excluding the
Excluded Assets):

> (i)     the Product ANDAs;
> (ii)    any correspondence with the FDA in Seller's possession or control
>         with respect to the Product ANDAs;
> (iii)   annual and periodic reports relating to the Product ANDAs which
>         have been filed by or on behalf of Seller with the FDA, and adverse
>         event reports pertaining to the Products, in each case as are in
>         Seller's possession or control;
> (iv)    the Product Scientific and Regulatory Material[4];
> (v)     the Assigned Patents;
> (vi)    the Assigned Contracts;
> (vii)   the trademarks and tradenames owned by Seller set forth on
>         Schedule 2.2(a)(vii); and
> (viii)  any other assets belonging to Seller that are required to be
>         transferred pursuant to the Order."

---

[4]      "Product Scientific and Regulatory Material" means all technological, scientific,
chemical, biological, pharmacological, toxicological, regulatory, and Clinical Trial
materials and information. (DE 17-3 at 61)

(DE 17-3 at 127) Once again, the active pharmaceutical ingredient, Type I rotigotine, is not listed in the APA as a "Transferred Asset" Nor does the APA discuss the supply of rotigotine.

The APA then goes on to address the relationship between this contract and other contracts that may be at issue:

### SECTION 5.10. Contracts to be Assumed; Customers

> (a) Other than (i) the Assigned Contracts, (ii) any purchase orders or (iii) other Contracts with Customers **there are no other material Contracts related to the Products**.

(*Id.* at 133 (emphasis added)) Schedule 2.2(a)(vii) defines "Assigned Contracts": as "Rotigotine Transdermal Patch (Neupro) (a) Manufacture and Supply Agreement, dated as of June 6, 2016, by and between Teva Pharmaceuticals USA, Inc. and Tapemark." (DE 17-3 at 215) The APA also has a clause whereby it acknowledges that the APA supersedes all agreements between the parties (that is, Teva and Zydus) and shall not confer rights on third parties:

### SECTION 13.7. Entire Agreement; No Third-Party Beneficiaries

> This Agreement and the Exhibits and Schedules hereto constitute the entire agreement and supersede all prior agreements and understandings, both written and oral (including any letter of intent, memorandum of understanding or term sheet), between or among the parties hereto with respect to the subject matter hereof. Except as specifically provided herein, this Agreement is not intended to confer upon any Person other than the parties hereto any rights or remedies hereunder.

(*Id.* at 154)

Finally, the APA contains governing-law and forum-selection provisions:

### SECTION 13.8. Governing Law

> This Agreement and any and all matters arising directly or indirectly herefrom shall be governed by and construed and enforced in accordance with the Laws of the State of New York U.S.A. applicable to agreements made and to be performed entirely in such State.

**SECTION 13.9. Jurisdiction, Venue, Service of Process, Waiver Of Jury Trial**

> (a) Buyer and Seller agree to irrevocably submit to the exclusive jurisdiction of (i) the Supreme Court of the State of New York, New York County, or (ii) the United States District Court for the Southern District of New York, U.S.A., for the purposes of any suit, action or other proceeding arising out of this Agreement or any transaction contemplated hereby.

### E.   The Complaint

This dispute now arises because TAPI has informed Zydus that it will not supply Form I rotigotine. (*Id.* ¶ 18) The Complaint does not explain this inability or unwillingness to supply rotigotine.[5] Nevertheless, Zydus believes that TAPI could, if it wished, regain the ability to produce Form I rotigotine. (Compl. ¶ 19) Zydus claims that TAPI has thus breached the terms of the LOI supply contract. Zydus asserts that the LOI gives rise to obligations separate from the obligations within the APA, but that a reliable supply of Form I rotigotine was critical to its willingness to purchase Teva's rotigotine-related assets under the APA. (*Id.* ¶ 20)

Zydus now asserts three claims:

> **Count 1**: breach of contract related to the LOI;
>
> **Count 2**: specific performance; and
>
> **Count 3**: promissory estoppel.

TAPI moves to dismiss the Complaint. (DE 17) Primarily, TAPI asserts that this action should be dismissed because it was brought in the wrong forum. This action, says TAPI, is within the scope of the APA's forum selection clause, which requires that disputes be brought in New York. (TAPI Brf. at 11–

---

[5]     TAPI submits with its brief a letter from its counsel to counsel for Zydus, attributing the problem to a chemical phenomenon known as "disappearing polymorphism." The result, according to the letter, is that TAPI, for reasons beyond its (or any supplier's) control, cannot supply Form I rotigotine, but only Form II, which it says is equally suitable. (DE 20-3) TAPI's performance, according to counsel, is thus excused under the terms of the LOI by impossibility—a kind of force majeure (or, as we might call it, force chimique).

12) In support of its position, TAPI notes that on the same day this lawsuit was filed, Zydus filed a similar lawsuit in New York State Court against Teva (TAPI's parent) pursuant to the terms of the APA. (*Id.* at 10) TAPI also moves to dismiss Zydus's promissory estoppel claim. (*Id.* at 12)

## II.    Discussion

### A.    Legal standard

The issue of the applicability of the forum selection clause is presented in the context of a motion to dismiss, based on the allegations of the complaint and other documents properly considered on a Rule 12(b)(6) motion. Dismissal of Count 3 is likewise sought pursuant to Rule 12(b)(6).

Federal Rule of Civil Procedure 8(a) does not require that a complaint contain detailed factual allegations. Nevertheless, "a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *see Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 232 (3d Cir. 2008) (Rule 8 "requires a 'showing' rather than a blanket assertion of an entitlement to relief." (citation omitted)). Thus, the complaint's factual allegations must be sufficient to raise a plaintiff's right to relief above a speculative level, so that a claim is "plausible on its face." *Twombly*, 550 U.S. at 570; *see also West Run Student Housing Assocs., LLC v. Huntington Nat. Bank*, 712 F.3d 165, 169 (3d Cir. 2013).

That facial-plausibility standard is met "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). While "[t]he plausibility standard is not akin to a 'probability requirement' . . . it asks for more than a sheer possibility." *Id.*

Rule 12(b)(6) provides for the dismissal of a complaint if it fails to state a claim upon which relief can be granted. The defendant, as the moving party, bears the burden of showing that no claim has been stated. *Animal Science*

*Products, Inc. v. China Minmetals Corp.*, 654 F.3d 462, 469 n.9 (3d Cir. 2011). For the purposes of a motion to dismiss, the facts alleged in the complaint are accepted as true and all reasonable inferences are drawn in favor of the plaintiff. *New Jersey Carpenters & the Trustees Thereof v. Tishman Const. Corp. of New Jersey*, 760 F.3d 297, 302 (3d Cir. 2014). *See also* p. 5 n.3 (other documents which may be considered).

### B.    Analysis

#### i.  Governing Law: Forum Selection Clause

This issue presented here is whether TAPI is entitled to dismissal of the complaint because the APA contains a forum selection clause which requires disputes to be brought in New York. Zydus sues, however, under a separate agreement, the LOI, between itself and TAPI; the APA, which contains the forum selection clause, is a separate agreement between Zydus and another party—not TAPI but TAPI's parent, Teva.

The issue, then, is whether the parties' contractual relationship under the LOI in some manner falls under, or incorporates, the forum selection clause of the APA. The APA's forum selection clause, says TAPI, applies to both contracts because they are interrelated. Zydus counters that the APA covers only Teva's obligations with respect to a sale of assets; it does not cover disputes arising out of the LOI, a separate supply contract with TAPI.

The parties agree that there is nothing wrong with the forum selection clause on its face; it is *enforceable*, at least between the parties to the APA. In a federal diversity case, like this one, federal law governs enforceability, or the "effect to be given a contractual forum selection clause." *Jumara v. State Farm Ins. Co.*, 55 F.3d 873, 877 (3d Cir. 1995) (emphasis added; citing *Stewart Organization, Inc. v. Ricoh Corp.*, 487 U.S. 22 (1988)). That is so because "questions of venue and the enforcement of forum selection clauses are essentially procedural, rather than substantive, in nature...." *Id.* at 877 (citing *Jones v. Weibrecht*, 901 F.2d 17, 19 (2d Cir. 1991)). Under those federal standards, a forum selection clause is "prima facie valid and should be

enforced unless enforcement is shown by the resisting party to be unreasonable under the circumstances." *Foster v. Chesapeake Ins. Co.*, 933 F.2d 1207, 1219 (3d Cir. 1991) (quoting *Bremen v. Zapata Off–Shore Co.*, 407 U.S. 1, 10 (1972)). No such showing of unreasonableness is attempted here.

The parties' disagreement here instead involves the clause's *scope*: whether it extends to this particular dispute. State, not federal, law governs the scope of a forum selection clause. That is so because the intended scope of a clause is not a procedural issue, but a substantive question "of contract interpretation." *In re McGraw-Hill Global Educ. Holdings LLC*, 909 F.3d 48, 58 (3d Cir. 2018) (quoting *John Wyeth & Brother Ltd. v. CIGNA Int'l Corp.*, 119 F.3d 1070, 1073 (3d Cir. 1997)). In particular, state law covers the very issue presented here: "whether the [forum selection] clause applies to a non-signatory as an intended beneficiary or closely related party." *In re McGraw-Hill*, 909 F.3d at 58 (citing *Collins v. Mary Kay, Inc.*, 874 F.3d 176, 183–85 (3d Cir. 2017)).

The clause having been deemed enforceable, the court must then apply state law and decide whether the dispute before it falls within the reach of that forum selection clause. *See Dayhoff Inc. v. H.J. Heinz Co.*, 86 F.3d 1287, 1295–96 (3d Cir. 1996). "In other words, it decides whether the claims and parties involved in the suit are subject to the clause." *Collins,* 874 F.3d at 181 (citations and quotations omitted).[6]

---

[6]    Both sides at times seem to portray the issue, at least in the alternative, as one of enforceability, governed by federal law. (*See* TAPI Brf. 8 n.4; Zydus Brf. 10 *et seq.* (analyzing issue as one of "whether to enforce" the clause under federal law, but discussing it in the alternative under state law)). In some general sense, of course, *any* dispute about a forum-selection clause concerns the question of whether it will be "enforced." That facile view, however, would erase the well-established distinction between a clause's enforceability and its scope.

Fairly recently, in 2018, the U.S. Court of Appeals for the Third Circuit synthesized and clarified the law governing the distinction between the scope of the clause (analyzed under state law) and the enforceability of the clause (analyzed under federal law). That synthesis, set out here at length, guides my conclusion that the issue of a third party's being bound by a forum selection clause falls on the state-law side of the divide:

The question whether the forum selection clause covers this dispute between Zydus and TAPI, a non-signatory of the APA, is the issue that initially divides the parties. Accordingly, I will apply state contract law to determine whether this contract dispute under the LOI falls within the scope of the forum selection clause in the APA.

### ii.  Which state's contract law applies

There is a hitch, however. Even assuming that *some* state's contract law applies, the parties disagree as to *which* state's law applies. New York law, says

---

"The interpretation of a forum selection clause is an analytically distinct concept from the enforceability of that clause." *Collins v. Mary Kay, Inc.*, 874 F.3d 176, 181 (3d Cir. 2017). "The question of the scope of a forum selection clause is one of contract interpretation." *John Wyeth & Brother Ltd. v. CIGNA Int'l Corp.*, 119 F.3d 1070, 1073 (3d Cir. 1997). Our case law directs us to use state law to determine the scope of a forum selection clause—that is, "'whether the claims and parties involved in the suit are subject' to the clause." *Collins*, 874 F.3d at 180 (quoting *Martinez v. Bloomberg LP*, 740 F.3d 211, 217 (2d Cir. 2014)). State law, therefore, typically governs whether the clause covers a particular claim, as well as whether the clause applies to a non-signatory as an intended beneficiary or closely related party. *Collins*, 874 F.3d at 183–85 (applying Texas law to determine whether plaintiff's New Jersey Wage Payment Law claim fell within the scope of forum selection clause); *E.I. DuPont de Nemours & Co. v. Rhone Poulenc Fiber & Resin Intermediates, S.A.S.*, 269 F.3d 187, 196–98 (3d Cir. 2001) (applying Delaware law to determine whether party was third-party beneficiary or closely related); *Martinez*, 740 F.3d at 221–24 (explaining that federal law should not be used to determine the scope of a forum selection clause in a federal-question case); *cf. Wyeth*, 119 F.3d at 1074 (acknowledging applicability of English law but applying "general contract law principles" in light of the parties' briefing).

*In re McGraw-Hill Glob. Educ. Holdings LLC*, 909 F.3d 48, 58 (3d Cir. 2018).

Zydus cites *In re: Howmedica Osteonics Corp*, 867 F.3d 390, 407 (3d Cir. 2017), *cert. denied*, 138 S. Ct. 1288 (2018) (forum selection clause given no weight when analyzing venue factors because defendants were non-signatories). There, however, a forum selection clause had been found effective as between certain signatory parties, requiring a transfer of venue; the issue was whether the case would be split, or whether the non-signatory parties' cases would, so to speak, be forced to go along for the ride. Cases involving arbitration clauses are also inapplicable, in that the Federal Arbitration Act and federal policies govern. *In re Prudential Ins. Co. of Am. Sales Practice Litig. All Agent Actions*, 133 F.3d 225, 230 (3d Cir. 1998) (distinguishing mixed discussion of arbitration and forum selection in *Dayhoff, Inc. v. H.J. Heinz Co.*, 86 F.3d 1287, 1293-97 (3d Cir. 1996)).

TAPI; New Jersey law, says Zydus. Because no party claims that it intended
that the law of any other state or country apply, I will confine my analysis to a
choice between the laws of New York and New Jersey.

TAPI, citing the choice-of-law provision in the APA, more or less declares
that New York law applies. (*See* TAPI Brf. at 8–9 & n.4.) Its argument is to some
degree question-begging—*i.e.,* it applies the APA to determine whether the APA
applies. I start from the premise that, absent additional facts, A & B cannot
create a contract between B & C, no matter how clearly A & B express their
intent to do so. The dispute in this action, says Zydus, arises under the LOI,
not the APA; the APA's choice-of-law clause would therefore be no more
applicable than its forum-selection clause. The applicable state law, according
to Zydus, is that of New Jersey. (*See* Zydus Brf. at 15)[7]

The presence, or not, of a contractual choice-of-law provision does not
alter the familiar *Klaxon* rule that a court sitting in diversity will apply the
choice-of-law principles of the forum state (here, New Jersey):

> In diversity cases such as this one, we look to the choice-of-law
> rules of the forum state—the state in which the District Court
> sits—in order to decide which body of substantive law to apply to a
> contract provision, ***even where the contract contains a choice-
> of-law clause***. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S.
> 487, 496, 61 S.Ct. 1020, 85 L. Ed. 1477 (1941) (holding that a
> federal court sitting in diversity must apply the choice-of-law rules
> of the forum state); *Kruzits v. Okuma Mach. Tool, Inc.*, 40 F.3d 52,
> 55 (3d Cir. 1994) (applying Pennsylvania's choice-of-law rules in
> diversity case, despite the presence of choice-of-law clause
> selecting Illinois law, and concluding that Illinois law governs
> interpretation of indemnity clause of a lease agreement); *see also
> Weber*, 811 F.3d at 770-71 (explaining that "the presence or
> absence of a specific choice-of-law clause does not alter the core
> obligation of a federal court, sitting in diversity, to ascertain which

---

[7]     There is more than a whiff of opportunism in both sides' positions, however.
Consider that TAPI, the New Jersey party, objects to being subjected to its own state's
law. Zydus, content to be governed by New York law vis-à-vis Teva, objects to the
application of New York law, and insists on New Jersey law, vis-à-vis TAPI. As
discussed below, New Jersey law essentially dictates a New Jersey forum, while New
York law would at least open the door to application of the APA's New York forum
selection clause.

> body of substantive law to apply by implementing the choice-of-law rules of its home jurisdiction"); *Fireman's Fund Ins. Co. v. Great Am. Ins. Co. of N.Y.*, 822 F.3d 620, 641 (2d Cir. 2016); *H & R Block Tax Servs. LLC v. Franklin*, 691 F.3d 941, 943 (8th Cir. 2012); *Hitachi Credit Am. Corp. v. Signet Bank*, 166 F.3d 614, 623-24 (4th Cir. 1999); *Kohler v. Leslie Hindman, Inc.*, 80 F.3d 1181, 1184-85 (7th Cir. 1996).

*Mary Kay Inc.*, 874 F.3d at 183 (**emphasis** added). This is a pump-priming rule; without it, the analysis could never get started, because the issue of which state's law applies requires us to determine whose law governs *that* issue, which requires us to determine whose law governs *that* issue, and so on in infinite regress. Under *Klaxon,* I apply forum New Jersey *choice-of-law* rules to determine which state's *substantive* contract law governs the dispute over this issue. And "this issue"—head-spinningly—initially concerns the question of whether New Jersey was the proper forum in the first place.

New Jersey choice-of-law uses the most-significant-relationship test, which has two prongs. *Maniscalco v. Brother Int'l Corp.* (USA), 793 F. Supp. 2d 696, 704 (D.N.J. 2011), *aff'd*, 709 F.3d 202 (3d Cir. 2013); *see also Yocham v. Novartis Pharm. Corp.*, 736 F. Supp. 2d 875, 880 (D.N.J. 2010) ("Although the New Jersey Supreme Court has not explicitly adopted the Restatement's test for contract claims, New Jersey courts have regularly applied the 'most significant relationship' test to such claims." (citing cases)); *Agostino v. Quest Diagnostics Inc.*, 256 F.R.D. 437, 461 (D.N.J. 2009) (applying New Jersey's most significant relationship test to tort and breach of contract claims).

First, the court must determine whether a conflict actually exists between the potentially applicable laws. *P.V. v. Camp Jaycee*, 197 N.J. 132, 143, 962 A.2d 453 (2008) ("Procedurally, the first step is to determine whether an actual conflict exists. That is done by examining the substance of the potentially applicable laws to determine whether there is a distinction between them.") (internal quotations omitted). "[I]f no conflict exists, the law of the forum state applies." *Snyder v. Farnam Companies, Inc.*, 792 F. Supp. 2d 712,

717 (D.N.J. 2011) (quoting *P.V.*, 197 N.J. at 143, 962 A.2d 453). If there is no conflict, the analysis ends there.

Second, assuming a conflict does exist, the court must proceed to determine "which state has the 'most significant relationship' to the claim at issue by weighing the factors" in the applicable section of the Restatement (Second) of Conflict of Laws. *Agostino*, 256 F.R.D. at 462; *see also P.V.*, 197 N.J. at 144, 962 A.2d 453.

### 1.    Actual conflict between the laws of New York and New Jersey

Here a conflict does exist between New York and New Jersey law. These states differ as to whether and how a non-signatory to a contract can enforce a forum selection clause.

Under New York law, there are three circumstances under which a non-signatory can enforce a contract's forum selection clause:

(1) if the non-signatory is a third-party beneficiary of the agreement;

(2) if the non-signatory did not sign the agreement containing the forum selection clause, but did sign another agreement at the same time, between the same parties or for the same purpose, as part of a global transaction;

(3) if the non-signatory is closely related to one of the signatories.

*Freeford Ltd. v. Pendleton,* 53 A.D.3d 32, 39, 857 N.Y.S.2d 62, 67 (1st Dep't 2008).

TAPI contends that under New York law, it prevails. The first condition, it concedes, does not apply; TAPI is not a third-party beneficiary of the APA. Indeed, Section 13.7 of the APA specifically provides that it confers no such rights on third parties. *See* p. 7, *supra.* But TAPI contends that either or both of the second or third conditions has been met. (TAPI Brf. 9–10)

I turn to New Jersey law. New Jersey law contract law, as is common, permits a third-party beneficiary to enforce a contractual provision—the equivalent of condition no. 1 under New York law, cited above. *Town of Kearny v. New Jersey Rail Carriers, LLC*, No. A-1304-04T5, 2005 WL 2363101, at *3

(N.J. Super. Ct. App. Div. Sept. 28, 2005) ("A non-party cannot seek enforcement of a contract unless it 'clearly appear[s] that the contract was made by the parties with the intention to benefit the third party" and that "the parties to the contract intended to confer upon [the third-party] the right to enforce it."'(citation omitted)); *Haftell by Cumberland Ins. Grp. v. Busch*, No. A-1266-15T4, 2017 WL 1077045, at *2 (N.J. Super. Ct. App. Div. Mar. 22, 2017) ("Generally, unless the parties to a contract 'intend[ ] that a third party should receive a benefit which might be enforced in the courts[,]' a non-party having no privity of contract has no cause of action based on the contract." citing *Rieder Cmtys., Inc. v. Twp. of N. Brunswick*, 227 N.J. Super. 214, 222 (N.J. Super. Ct. App. Div.) (citations omitted), *certif. denied*, 113 N.J. 638 (1988)). As all agree, however, TAPI is not a third-party beneficiary, and the APA specifically rules out such a third-party beneficiary claim. *See* p. 15, *supra*.

The New Jersey case law does not anywhere recognize New York's second "global transaction" exception or third "closely related" exception. There being no state Supreme Court precedent on point, I must range farther afield. More precisely, I am required to predict how the Supreme Court of New Jersey would decide the issue. That is not an invitation to crystal-ball gazing, however. The "prediction" must be solidly based on the usual tools of legal interpretation:

> "[I]n the absence of guidance from the state's highest court, [I] must look to decisions of state intermediate appellate courts, of federal courts interpreting that state's law, and of other state supreme courts that have addressed the issue," as well as to "analogous decisions, considered dicta, scholarly works, and any other reliable data tending convincingly to show how the highest court in the state would determine the issue at hand."

*Norfolk Southern Ry. Co. v. Basell USA Inc.*, 512 F.3d 86, 92 (3d Cir. 2008) (quoting *Koppers Co., Inc. v. Aetna Cas. & Sur. Co.*, 98 F.3d 1440, 1445 (3d Cir. 1996)); *see also West v. AT&T Co.*, 311 U.S. 223, 237 (1940); *Hunt v. U.S. Tobacco Co.*, 538 F.3d 217, 220-21 (3d Cir. 2008); *McCabe v. Ernst & Young, LLP*, 494 F.3d 418, 424 (3d Cir. 2007).

The only New Jersey Appellate Division case law is contrary to the New York view; it holds that only signatories to an agreement are entitled to enforce a forum-selection clause. *See McNeill v. Zoref*, 297 N.J. Super. 213, 220 (N.J. Super. Ct. App. Div. 1997)("forum selection clauses can only be enforced by the signatories to those agreements"); *Estate of Adler v. Wells Fargo Home Mortg.*, No. A-5448-16T4, 2017 WL 6347576, at *2 (N.J. Super. Ct. App. Div. Dec. 13, 2017) ("the forum selection clause was enforceable only by or against the signatories to the brokerage agreement."); *YA Glob. Investments, L.P. v. Cliff*, 419 N.J. Super. 1, 10, 15 A.3d 857, 862 (N.J. Super. Ct. App. Div. 2011) (affirming trial court's holding that an agreement's forum selection clause did not constitute consent to jurisdiction by non-signatory third parties where the contractual language clearly bound its signatory parties only).

New Jersey's intermediate appellate case law is concededly thin, and to some degree is confounded by other issues, such as arbitration and the entire controversy doctrine. Still, it is the best guide to New Jersey law. To take the alternative view would require this federal court to ignore what little case law there is and to fabricate on New Jersey's behalf a three-part scheme similar to that of New York.

Federal courts in this district, it is true, have bound non-signatories to forum selection clauses in diversity cases—repeatedly, it must be said, and in no uncertain terms.[8] Those cases, however, do not seem to have arrived at their holdings through the process of predicting how the New Jersey Supreme Court would decide the issue. Rather, they seem to have applied federal

---

[8]        *See, e.g., Demodulation, Inc. v. Applied DNA Scis., Inc.*, No. CIV.A. 11-0296 WJM, 2011 WL 6756069, at *3 (D.N.J. Dec. 22, 2011) (applying federal law in a contract dispute in federal court based on diversity); *Four River Expl., LLC v. Bird Res., Inc.*, No. CIV. A. 09-3158 (JAP, 2010 WL 216369, at *3 (D.N.J. Jan. 15, 2010) (same); *Howmedica Osteonics Corp. v. Bagwell*, No. CV 16-1980 (JLL), 2016 WL 9185294, at *4 (D.N.J. July 14, 2016) (same); *Sahara Sam's Oasis, LLC v. Adams Companies, Inc.*, 2010 WL 3199886, at *6 (D.N.J. Aug. 12, 2010); *PNY Techs., Inc. v. Miller, Kaplan, Arase & Co., LLP*, No. CIV.A. 14-4150 ES, 2015 WL 1399199, at *5–8 (D.N.J. Mar. 24, 2015).

common law standards.[9] As of 2018, it has become clear, if it was not clear before, that federal law governs only the issue of enforceability *simpliciter;* state contract law governs the issue of scope, *i.e.,* whether a valid clause extends to a non-signatory. *See In re McGraw-Hill Glob. Educ. Holdings LLC*, 909 F.3d 48, 58 (3d Cir. 2018) (cited and quoted at pp. 11–12 & n. 6, *supra*). I therefore discount the importance of these district court holdings in determining how the New Jersey Supreme Court would decide the issue.

The holdings of the highest courts of states other than New Jersey point both ways. Here are some examples:

**Alabama**: Held that a non-signatory may be bound by a forum selection clause where claims were closely related to contract and analogizing its hold to its "enforcement of arbitration clauses as to nonsignatories to a contract and the enforcement of the forum-selection clause in this instance. This Court has stated that [i]f a nonsignatory's claims are intertwined with and related to the contract, arbitration can be enforced." *Ex parte Killian Constr. Co.*, 276 So. 3d 201, 208 (Ala. 2018) (internal quotations and citations omitted).

**West Virginia**: Held that "A range of transaction participants, signatories and non-signatories, may benefit from and be subject to a forum selection clause. In order for a non-signatory to benefit from or be subject to a forum selection clause, the non-signatory must be closely related to the dispute such that it becomes foreseeable that the non-signatory may benefit from or be subject to the forum selection clause." *Caperton v. A.T. Massey Coal Co.*, 225 W. Va. 128, 133, 690 S.E.2d 322, 327 (W. VA. 2009).

**Wyoming**: Declined to "enforce forum selection clauses in favor of nonparties [who are] 'closely related' to a signatory" because doing so would undermine basic principles of a freedom of contract, namely that parties to a contract have notice of its provisions and know that the

---

[9]      Federal common law, applicable in non-diversity cases, is closer to that of New York. "In the Third Circuit, a non-signatory party may enforce a forum selection clause in a contract if the party is a third-party beneficiary of the contract or is closely related to the contractual relationship or dispute such that it is foreseeable that the party will be bound." *D'Elia v. Grand Caribbean Co., Ltd.*, No. 09–1707, 2010 WL 1372027, at *3 (D.N.J. Mar. 30, 2010); *see First Fin. Mgmt. Grp.*, 2012 WL 1150131, at *3 (quoting *Donachy v. Intrawest U.S. Holdings, Inc.*, No. 10–4038, 2011 WL 2973543, at *2 (D.N.J. July 21, 2011) ("Third parties that 'should have foreseen governance by the clause' may also be bound by it.")).

contract can be enforced by, or against, either party to the contract. *Venard v. Jackson Hole Paragliding, LLC*, 2013 WY 8, ¶ 22, 292 P.3d 165, 172 (Wyo. 2013).

In most other states, it appears that the highest courts have not issued any decision on point.[10]

The most analogous case law—third-party enforcement of arbitration clauses—is unhelpful because it tends to rely on uniform pronouncements of federal law under the Federal Arbitration Act. *See, e.g., In re Prudential Ins. Co. of Am. Sales Practice Litig. All Agent Actions*, 133 F.3d 225, 229 (3d Cir. 1998) ("As this court has previously recognized, 'a variety of nonsignatories of arbitration agreements have been held to be bound by such agreements under ordinary common law contract and agency principles.'" (citations omitted). I found no useful or widely accepted commentary or secondary literature.

---

[10]   Several intermediate state courts have identified various tests for determining whether to enforce a forum selection clause against a non-signatory. I give such out-of-state, intermediate appellate authority little weight.

   Thus the Texas Supreme Court, in the course of declining to promulgate a test, noted that the state's intermediate appellate courts had looked to the relationship of the parties. *See Pinto Tech. Ventures, L.P. v. Sheldon*, 526 S.W.3d 428, 444 (Tex. 2017) (noting that "as articulated by our intermediate appellate courts, the transaction-participant theory is similar to the doctrine federal courts employ to bind nonsignatories to forum-selection clauses when they are 'closely related to the contractual relationship.' . . . We need not decide whether a transaction participant could enforce a forum-selection clause, or under what circumstances. . . ."). The intermediate appellate court in Delaware has adopted a test akin to that of New York. *In re Bracket Holding Corp. Litig.*, No. CVN15C02233WCCCCLD, 2017 WL 3283169, at *15 (Del. Super. Ct. July 31, 2017) (stating "a three-part test to determine whether a non-signatory may be bound by a forum selection clause. First, is the forum selection clause valid? Second, is Stewart a third-party beneficiary or closely related to the contract? Third, does the claim arise from his standing relating to the agreement?"). Even New York's test, incidentally, has not received the *imprimatur* of its Court of Appeals, although it has been solidly endorsed by the First and Second Departments. *See May v. U.S. HIFU, LLC*, 98 A.D.3d 1004, 951 N.Y.S.2d 163 (2d Dep't 2012); *Tate & Lyle Ingredients Americas, Inc. v. Whitefox Technologies USA, Inc.*, 98 A.D.3d 401, 949 N.Y.S.2d 375 (1st Dep't 2012); *Bernstein v. Wysoki*, 77 A.D.3d 241, 907 N.Y.S.2d 49 (2d Dep't 2010); *Freeford Ltd. v. Pendleton*, 53 A.D.3d 32, 39, 857 N.Y.S.2d 62, 68 (1st Dep't 2008).

In short, the best and most authoritative indicator of New Jersey law is contained in the intermediate appellate case law, which holds that, absent third-party beneficiary status, a non-signatory is not within the scope of an agreement's forum selection clause. Accordingly, I find that there exists a consequential conflict between the laws of New Jersey and New York regarding the enforcement of forum selection clauses.

Zydus contends that under New Jersey law, it prevails: TAPI, a non-signatory to the APA, cannot invoke the APA's forum selection clause.

## 2.    Most significant relationship

Because there is an actual conflict, I must apply the choice-of-law rules of the forum state, New Jersey, to determine "which state has the most meaningful connections with and interests in the transaction and the parties." *NL Industries, Inc. v. Commercial Union Ins. Co.*, 65 F.3d 314, 319 (3d Cir. 1995). In making this determination, the Court looks to the "enumeration of contacts" indicated in the Restatement (Second) of Conflicts § 188 "to guide the identification of the state with the most significant relationship" to the transaction. *Id.* at 320. Specifically, the Court must consider

(1) the place of contracting,

(2) the place of negotiation of the contract,

(3) the place of performance,

(4) the location of the subject matter of the contract, and

(5) the domicile, residence, nationality, place of incorporation and place of business of the parties.

Restatement (Second) of Conflicts § 188(2). "These contacts are to be evaluated according to their relative importance with respect to the particular issue." *Id.*

There is a hitch, however: For purposes of evaluating these five factors, which is the relevant "contract," the APA or the LOI? I believe it is the latter. The "particular issue" being litigated, in its most general terms, is whether TAPI breached its obligation to supply Form I rotigotine under the LOI. The essential contract claim here is not for breach of the APA; it is for breach of the LOI.

Focusing on the forum-selection issue, it is not so much whether the APA's forum-selection clause applies of its own force; it is whether Zydus and TAPI, in entering into the LOI, meant to incorporate it. The Restatement's "significant relationship" factors, then, will be evaluated with respect to the LOI.

The parties, in their briefs, are talking past each other. TAPI, for example, posits that New York law applies based on the forum selection clause in the APA, and does not give the Court the benefit of its view of New Jersey law. Based on the limited record placed before me, however, I will analyze the five factors under Restatement (Second) of Conflicts § 188.

Factor 5, the location and domicile of the parties, favors New Jersey—at least as compared to New York. According to Zydus's complaint, TAPI is a New Jersey corporation, located in Woodcliff Lake, New Jersey, and the LOI letterhead seems to bear that out. (Compl. ¶ 6; DE 20-2) Zydus is not located in New Jersey, but there is no indication that it is located in New York, either; its complaint states that it is a company of the United Arab Emirates, having its principal place of business in Dubai. (Compl. ¶ 6) Having entered into a contract with a New Jersey entity, Zydus is content to submit to jurisdiction in New Jersey and apply New Jersey law. (Oddly, as I have already noted, it is TAPI, the New Jersey party, which objects.) I do not perceive that either party is domiciled in, resides in, is incorporated in, or has expressed any connection to, New York.

Based on the allegations in the complaint and the LOI itself, I infer that factors 1 and 2, the place of contracting and place of negotiation of the LOI, favor New Jersey. The LOI appears to have been negotiated and drafted, at least on TAPI's part, in New Jersey. As the name implies, the agreement is in the form of a letter drafted by TAPI. That letter is written on TAPI's New Jersey letterhead and addressed to Zydus in Dubai, United Arab Emirates. It is countersigned by Zydus's Executive Director, presumably upon receipt of the

letter in Dubai. At any rate, nothing before me suggests that New York has any connection to the negotiation or place of contracting of the LOI.[11]

Factor 3, place of performance, and factor 4, the location of the subject matter of the contract, do not clearly point to New Jersey or New York. According to the complaint, TAPI produces Form I rotigotine at its facility in Croatia. (Compl. ¶ 13) The LOI, however sets the price in "US dollars and CIP Air St. Paul, MN USA."[12]

Based on the limited facts as pled and marshaled by the parties in their papers, I must find that these factors favor application of New Jersey law over that of New York.

TAPI has much to say, plausible if thinly documented, about the manner in which the availability of the supply under the LOI was meant to function within the larger transaction under the APA. The short answer is that under New York law, it might matter; under New Jersey law, it does not. Under New Jersey law, TAPI cannot enforce the forum selection clause in the APA against Zydus because TAPI is not a signatory to, or third-party beneficiary of, the APA or any other agreement with Zydus that has a forum selection clause. *See McNeill*, 297 N.J. Super. at 220; *Kearny*, 2005 WL 2363101, at *3. The forum selection clause cannot be used to shift this case from this, the forum in which it was filed.

A final note. The record is perhaps not ideally developed, but on the record before me, even if I (like other courts in this district) applied federal common law (which is fairly similar to that of New York), I would likely reach the same ultimate result. Assume *arguendo* that a non-signatory party may

---

[11]    Teva, for what it is worth, is identified in the FTC's Decision and Order as an Israeli firm, to be contacted *via* Teva North America, presumably an affiliate, located in Horsham, PA. (DE 17-3 at 3)

[12]    *I.e.*, Carriage and Insurance Paid for shipment by air to the specified destination, St. Paul, Minnesota. The reference would seem to be to incoterms, a set of standards for sale of goods promulgated by the International Chamber of Commerce. *See* https://iccwbo.org/resources-for-business/incoterms-rules/incoterms-rules-2010/ (definition of CIP).

"enforce a forum selection clause in a contract if the party is a third-party beneficiary of the contract or is closely related to the contractual relationship or dispute such that it is foreseeable that the party will be bound," *D'Elia*, 2010 WL 1372027, at *3; *see also* cases cited at pp. 17–18 & nn. 8–9. As noted above, neither party claims that TAPI is a third-party beneficiary of the APA. Judges of this Court have held that for these purposes, parties are "closely related" where, for example, employees of a corporation directly benefit from a contract that binds the corporation. *See Affiliated Mortg. Prot., LLC v. Tareen*, No. CIV.A.06 4908 DRD, 2007 WL 203947, at *4 (D.N.J. Jan. 24, 2007). Parties have also been found to be closely related where, following the execution of an agreement with a forum selection clause, the non-signatory signed an ancillary agreement through which the non-signatory acknowledged receipt of the primary contract and agreed to discharge certain duties in accordance with the terms of that primary contract. *See Cambridge Mgmt. Grp., LLC v. Baker*, No. CIV. 12-3577 NLH/KMW, 2013 WL 1314734, at *9 (D.N.J. Mar. 28, 2013). By contrast, parties have been found not "closely related" where the non-signatory party was not mentioned in the relevant agreement, the party was not assigned obligations under the agreement, and the performance of the agreement was not dependent on that party's services. *Donachy v. Intrawest U.S. Holdings, Inc.*, No. CIV.A. 10-4038 RMB, 2011 WL 2973543, at *3 (D.N.J. July 21, 2011).

Here, I do not find that that TAPI and Teva are "closely related" or even that this is a "global transaction," for several reasons:

- TAPI is a separate corporation, not an employee or agent of Teva.
- There are no allegations that TAPI was involved in negotiating the APA or that TAPI directly benefited from the APA.
- The APA explicitly disclaims any benefit to third parties, does not assume the LOI, and states that there are no other material Contracts related to the Products (*see* p. 7, *supra*).
- The LOI was negotiated before the APA, and the duties owed under the two contracts are distinct. The LOI was an ongoing supply contract for

23

Form I rotigotine; under the APA, the parties contracted for one-time sales of various assets.

- TAPI is not mentioned in the APA (apart from a single reference in a schedule), TAPI has no obligations under the APA, and no duty in the APA was made dependent on TAPI's services. *See* Section I.D, *supra*; *Donachy*, 2011 WL 2973543, at *3.

- Zydus concededly entered into the LOI with TAPI as part of its preparation to manufacture the generic Rotigotine product. It is not alleged that the two contracts are interdependent in the sense that TAPI is the only possible source for Form I rotigotine.

- Even assuming that TAPI is a unique source of supply, without which the rotigotine divestiture could not meaningfully function, there is nothing about this arrangement that depends upon supply disputes being adjudicated in the courts of New York.

Accordingly, and in the alternative, even under the federal common law standard it cannot be said that Zydus, TAPI, TEVA, and/or the relevant transactions are so closely interrelated as to subject TAPI as a non-signatory to the forum-selection clause in the APA.

### C. Transfer of venue

TAPI seeks outright dismissal based on the forum selection clause, but various forms of alternative relief are suggested at various points in the briefs. Zydus suggests as one form of alternative relief that this New Jersey action be stayed in favor of the action it filed against Teva under the APA in New York State Court. Zydus also suggests that if this case must proceed in New York, the proper remedy would be a transfer of venue to the U.S. District Court for the Southern District of New York. *See* 28 U.S.C. § 1404. (Zydus Brf. 29) TAPI would oppose transfer as "contrary to the public interest."[13] (TAPI Reply Brf.

---

[13]    TAPI is the party, mind you, that seeks a New York forum. Presumably it seeks through dismissal to force Zydus's hand in some manner and consolidate the two actions.

13–14) To be clear, I decline to transfer, or otherwise stay or dismiss this litigation.

*Dismissal*:  Dismissal might be called for if I had found that a forum selection clause controlled and required that the action be brought in a non-federal forum. *See, e.g., Salovarra v. Jackson Nat'l Life Ins. Co.*, 246 F.3d 289, 297–98 (3d Cir. 2001) (holding that if the forum selection clause specifies a non-federal forum, the "district court must dismiss the action so it can be filed in the appropriate forum so long as the dismissal would be in the interests of justice."). I have already found, however, that the forum selection clause does not control, and there are no other grounds for dismissal of this action.[14]

*Transfer*:  I consider a transfer of venue to the Southern District of New York (obviously, I cannot transfer the case to New York state court). I conclude that a transfer of venue would not be appropriate.

Under Section 1404(a), the Court may "For the convenience of parties and witnesses, in the interest of justice, . . . transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented." A district court has "broad discretion to determine, on an individualized, case-by-case basis, whether convenience and fairness consideration weigh in favor of transfer." *Jumara v. State Farm Ins. Co.*, 55 F.3d 873, 883 (3d Cir. 1995) (citing *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22 (1988)). That decision is to be guided by a number of non-exclusive public and private interest factors:

> The private interests have included: plaintiff's forum preference as manifested in the original choice, the defendant's preference, whether the claim arose elsewhere, the convenience of the parties as indicated by their relative physical and financial condition; the convenience of the witnesses—but only to the extent that the witnesses may actually be

---

[14]   I note, moreover, that Teva has made a motion to dismiss or stay the New York State action. (DE 20-4) Thus in each forum, the defendant argues that the court should defer to the other. For both motions to be granted—leaving no forum at all—would obviously be an absurd result. I understand that where there are two lawsuits, a party must cover its bases, but the Court must consider how such rulings would fit together.

unavailable for trial in one of the fora, and the location of books and records (similarly limited to the extent that the files could not be produced in the alternative forum).

The public interests have included: the enforceability of the judgment; practical considerations that could make the trial easy, expeditious, or inexpensive; the relative administrative difficulty in the two fora resulting from court congestion, the local interest in deciding local controversies at home; the public policies of the fora, and the familiarity of the trial judge with the applicable state law in diversity cases.

*Id.* at 879–80 (internal citations omitted). The burden of persuasion rests with the party requesting a change of venue. *Id.*

In brief, Zydus's preferred venue is New Jersey, as evidenced by the fact that it sued here (possibly believing it had little choice). A transfer to a New York federal district court would still require litigation in two forums: New York state court and New York federal court. Convenience and cost to TAPI mildly favor a New Jersey forum, though New York is not very far away. The cost and inconvenience to Zydus, a company located in Dubai, would presumably be similar in either forum. These factors, then, tip very slightly in favor of New Jersey.

As to public factors, enforcement of any judgment against a New Jersey corporation might be marginally easier in New Jersey, but enforcement procedures are available in New York as well. Certain acts concerning the LOI are alleged to have occurred in New Jersey (and none in New York), so this state has an interest in deciding local controversies "at home." As noted, New Jersey contract law will govern the LOI, although issues of New York law may become relevant, if only as background. These factors weigh mildly in favor of denying transfer. Court congestion does weigh slightly in favor of transfer. The Administrative Office of the Courts has declared the District of New Jersey to be in a state of judicial emergency, with weighted filings of 903 cases per judgeship, the second highest in the nation. Of 17 allocated judgeship slots, 6 are vacant. https://www.uscourts.gov/judges-judgeships/judicial-vacancies/judicial-emergencies.

On balance, these factors lean in favor of denying a transfer of venue and retaining Zydus's choice of forum which is, after all, in the defendant's home state.

*Stay*:  To the extent either parties' briefing can be interpreted to request a stay of this matter, any such request would be premature. Neither this action nor the New York action is close to a decision on the merits. TAPI and Teva, though affiliates, are distinct, so the proceedings are not entirely parallel, though they are related. Even "parallel proceedings," however, "are ordinarily permitted to proceed simultaneously, at least until one has reached the stage where its ruling becomes res judicata." *Gen. Elec. Co. v. Deutz AG*, 270 F.3d 144, 157 (3d Cir. 2001). *See also Univ. of Maryland at Baltimore v. Peat Marwick Main & Co.*, 923 F.2d 265, 275–76 (3d Cir. 1991)("The general rule regarding simultaneous litigation of similar issues in both state and federal courts is that both actions may proceed until one has come to judgment, at which point that judgment may create a res judicata or collateral estoppel effect on the other action.").

Meanwhile, the parties will develop their legal issues and conduct discovery, which may be coordinated between the two actions to avoid duplication. Should the issues start to converge in some relevant manner, a renewed request for a stay may be entertained.

Accordingly, I will **deny** all requests, whether made formally by way of motion or informally in briefs, to dismiss, stay, or transfer this action.

### D.    Promissory Estoppel

TAPI moves to dismiss Count 3, Zydus's claim of promissory estoppel because a valid and enforceable contract, the LOI, governs the parties' relationship and obligations. (TAPI Brf. at 21–22; TAPI Reply Brf. at 19) Zydus contends that this claim was pled in the alternative should the court determine the there is no enforceable contract requiring TAPI to supply it with Form I rotigotine. (Zydus Brf. at 39–40) Thus, says Zydus, it would be premature to dismiss this claim. I disagree and will grant TAPI's motion to dismiss Count 3,

without prejudice to reinstatement should developments in the case warrant such relief.

"[U]nder New Jersey law, liability based on quasi-contractual principles cannot be imposed 'if an express contract exists concerning the identical matter.'" *Freightmaster USA, LLC v. Fedex, Inc.*, No. 14-3229, 2015 WL 1472665, at *6 (D.N.J. Mar. 31, 2015) (quoting *Suburban Transfer Serv., Inc. v. Beech Holdings, Inc.*, 716 F.2d 220, 226-27 (3d Cir. 1983)). Promissory estoppel "cannot be maintained where a valid contract fully defines the parties' respective rights and obligations." *Hillsborough Rare Coins, LLC v. ADT LLC*, No. CV 16-916 (MLC), 2017 WL 1731695, at *6 (D.N.J. May 2, 2017) (citation omitted); *see also Hill v. Commerce Bancorp, Inc.*, 2012 WL 694639, at *14 (D.N.J. Mar. 1, 2012) (holding that party "cannot prevail on both a breach of contract and promissory estoppel theory for the same conduct, since promissory estoppel by its definition assumes that a contract supported by consideration has not been formed."). "[P]romissory estoppel generally serves as a stopgap where no valid contract exists to enforce a party's promise." *Kiss Elec., LLC v. Waterworld Fiberglass Pools, N.E., Inc.*, 2015 WL 1346240, at *5 (D.N.J. Mar. 25, 2015).

Neither side is saying, however, that Zydus could *prevail* on both a breach of contract and promissory estoppel theory. Both have identified the LOI as a contract that defines the parties' respective rights and obligations. Even at this early stage, it appears likely that this action will stand or fall on the claim of breach of the LOI. Quasi-contract theories classically come into play where a party has induced reliance or conferred a benefit pursuant to, *e.g.,* an agreement that turns out to be barred by the statute of frauds, or with a party that lacked the capacity to contract. Such a scenario appears dubious in the case of the LOI, an unperformed, written, executory contract negotiated by counsel between sophisticated commercial parties.

Zydus's promissory estoppel claim appears to be nothing more than a recasting of its breach of contract claim. So understood, it contributes little but

clutter. The alleged "promise" is nothing more than the undertaking in the contract itself: "LOI expresses a clear and definite promise by TAPI to supply commercial quantities of the API, Form I rotigotine, at a definite price for an initial three-year term, automatically extended for two successive 2-year renewal terms." (Compl. ¶ 36) The injury alleged is intrinsic to the terms and conditions of the LOI, and is indistinguishable from a breach of contract.

I am therefore inclined to follow cases which, even on a 12(b)(6) motion, have dismissed quasi-contract claims in favor of a straightforward breach of contract claim. *See Freightmaster*, 2015 WL 1472665 (dismissing promissory estoppel claim where express contract governed parties' relationship); *Hillsborough*, 2017 WL 1731695 (same); *Smith v. Citimortgage, Inc.*, No. CV 15-7629 (JLL), 2015 WL 12734793, at *8 (D.N.J. Dec. 22, 2015) (dismissing promissory estoppel and unjust enrichment claims based on the same facts and theory as contract claim); *Kinney Bldg. Assocs., L.L.C. v. 7-Eleven, Inc.*, No. 2:15-CV-7917-SDW-LDW, 2016 WL 2855063, at *5 (D.N.J. May 16, 2016); *Emteclnc, v. Condor Tech. Solutions, Inc.*, 1998 WL 834097, at *2-3 (E.D. Pa. Nov. 30, 1998) (plaintiff denied leave to amend complaint to include unjust enrichment claim because parties' relationship was based on express written contract).

Because there is an express contract governing the subject matter of the promissory estoppel claim, that claim is dismissed. *See Adler Engineers, Inc. v. Dranoff Properties, Inc.*, No. CIV. 14-921 RBK/AMD, 2014 WL 5475189, at *12 (D.N.J. Oct. 29, 2014)). This dismissal is, however, without prejudice to reinstatement of the promissory estoppel claim by amendment should developments warrant it.

### III.   Conclusion

For the reasons set forth above, I will **grant in part and deny in part** defendant TAPI's motion to dismiss (DE 17). The motion to dismiss Counts 1 and 2 based on the forum selection clause in the APA is **denied**. The motion to dismiss Count 3, the claim for promissory estoppel, is **granted**. For the

avoidance of doubt, to the extent the alternative relief of dismissal, transfer of venue, or a stay of this action has been requested, it is **denied**.

An appropriate order follows.

Dated: May 20, 2020

/s/ Kevin McNulty

_____

**Kevin McNulty**
**United States District Judge**